798 So.2d 263 (2001)
STATE of Louisiana
v.
Russell KIRKLAND.
No. 01-KA-425.
Court of Appeal of Louisiana, Fifth Circuit.
September 25, 2001.
*265 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant D.A., Alison Wallis, Assistant D.A., Ron Austin, Assistant D.A., Joan Benge, Assistant D.A., Gretna, LA, For Plaintiff-Appellee.
Bruce G. Whittaker, Louisiana Appellant Project, New Orleans, LA, For Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and THOMAS F. DALEY.
EDWARD A. DUFRESNE, JR., Chief Judge.
The Jefferson Parish Grand Jury returned an indictment charging defendant, Russell Kirkland, with the first degree murder of David Johnson, in violation of LSA-R.S. 14:30.[1] The state subsequently amended the indictment to charge defendant with second degree murder, in violation of LSA-R.S. 14:30.1. The matter proceeded to trial before a twelve person jury at the conclusion of which defendant was found guilty as charged. The judge sentenced defendant to the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence. It is from this conviction and sentence that defendant now appeals. For the reasons set forth herein, we affirm.

FACTS
In December 1997, co-defendants Levy Dickerson and Richard Strippling had an altercation with the victim, David Johnson. The fight involved Johnson's girlfriend, Misty, who was at Dickerson's apartment at the time. Johnson went to Dickerson's apartment to get Misty. In his attempt to get Misty to go home with him, Johnson pulled her by the hair. Dickerson did not like the way Johnson was treating Misty so Dickerson hit Johnson and a fight ensued. Strippling, who was also present at *266 the apartment, joined in the fight. The police were called and Johnson was arrested for unauthorized entry and criminal damage to Dickerson's apartment.
Shortly after the altercation, Misty moved out of Johnson's apartment and into Dickerson's apartment. In addition to moving her things into Dickerson's apartment, Misty also moved Johnson's stereo. When Johnson was released from jail after the altercation, he asked for his stereo back. Against the wishes of Dickerson and Strippling, Misty returned Johnson's stereo. Approximately one week later, Misty moved out of Dickerson's apartment.
Approximately one month later, on the evening of January 16, 1998, Dickerson and Strippling were at a get-together in Slidell at Strippling's ex-girlfriend's trailer. The group gathering consisted of Dickerson; his girlfriend, Inez; Strippling; his ex-girlfriend, Terry; defendant, Russell Kirkland; and his girlfriend, Natasha. During the course of the evening, the group played cards and drank. At one point, Strippling and Dickerson pulled out a .357 revolver and a shotgun. Strippling, Dickerson and defendant played with the guns and posed for pictures with the guns. During the "gun play," Dickerson began discussing David Johnson. Dickerson stated he wanted to get Johnson back and take his stereo.
Strippling then loaded the .357 revolver with hollow tip bullets. Thereafter around 2:30-3:00 a.m., the three men, Dickerson, Strippling and defendant, left Slidell and headed for Johnson's apartment on Faith Place in Terrytown. The men were armed with the .357 revolver and a key to the victim's apartment.[2]
At approximately 4:22 a.m., Deputy Derrick Leggett responded to an anonymous 911 call regarding the discharge of a firearm in the 1700 block of Faith Place. The caller reported four shots were fired. Deputy Leggett canvassed the area but did not find anything or anyone. Thereafter, around 5:00 a.m., Deputies Lenny Brown and Chris Fisher were on separate patrol in the Faith Place area when they heard gunshots. En route to the area where they believed the gunshots originated, Brown and Fisher encountered a vehicle coming around the corner at a high rate of speed and being operated in a careless manner. Deputy Fisher stopped the vehicle and ordered the three occupants, Dickerson, Strippling and defendant, to exit the vehicle.
During the traffic stop, a call came in about a shooting on Faith Place. Deputy Brown left the traffic stop and responded to the call. When he arrived at the scene of the shooting, he saw David Johnson lying dead in the doorway of a second story apartment. An autopsy revealed Johnson had died of multiple gunshot wounds with perforating wounds to the femoral artery, liver and lung. Deputy Brown recognized the victim from an incident one month earlier involving the victim and Dickerson, the driver of the vehicle. As such, Deputy Brown instructed Deputy Fisher via radio to hold the occupants of the vehicle. Deputy Fisher placed the three occupants in the back of his patrol car.
A search of the stopped vehicle revealed a .357 revolver with six spent casings on the back seat where defendant was sitting. Later tests revealed the projectiles recovered from the victim's body and other copper jackets recovered from the scene of the murder were fired from the same .357 found in the vehicle. A gunshot residue test (GSR) was conducted on all three occupants of the vehicle within two hours *267 of the initial traffic stop. Later test results revealed both defendant and Strippling tested positive for gunshot residue but no significant particles related to gunshot residue were found on Dickerson. Additionally, a key to the victim's apartment was later found in Deputy Fisher's patrol car under the back seat cushion where defendant, Dickerson and Strippling had been held.
The three men were subsequently transported to the detective bureau. Defendant gave two statements to Detective Dennis Thornton after being advised of his Miranda rights. Both statements were played for the jury. In defendant's first statement, taken at 9:11 a.m., he explained that he had been in Slidell with his girlfriend playing cards when Dickerson and Strippling began talking about doing something to a guy to prevent the guy from testifying in court. Defendant claimed Dickerson and Strippling never identified the guy and only indicated he lived on the Westbank. Thereafter, Strippling loaded the .357 revolver and the three of them left Slidell and headed to New Orleans. Defendant stated he fell asleep in the back seat and awoke after hearing three gunshots. He then saw Dickerson and Strippling running towards the car. Defendant stated he was told Dickerson had shot the guy in the living room of the guy's apartment. Defendant denied ever exiting the car. When Dickerson and Strippling came back to the car, Dickerson drove them to Bourbon Street. However, Dickerson wanted to make sure the guy was dead so the three men went back to the victim's apartment. Upon their return, defendant claimed he stayed in the vehicle while Dickerson and Strippling put socks on their hands and left the car. Defendant later heard six shots. Thereafter, Dickerson and Strippling returned to the car wiping blood off their faces. Defendant was given the gun which he put under the back seat cushion. As they drove away from the scene, they were stopped by the police.
In defendant's second statement, given the same day at 12:20 p.m., he changed his story somewhat and admitted getting out of the vehicle when they first arrived at the victim's apartment. He stated he went up the stairs to the victim's apartment where Dickerson used a key to open the door. He further stated he went into the victim's apartment with Dickerson while Strippling stood outside. Defendant claimed he walked out of the apartment before Dickerson fired the gun. Defendant continued to maintain that he did not go near or into the victim's apartment at any time during the second trip.
Defendant was subsequently arrested and charged with first degree murder.

SUFFICIENCY OF THE EVIDENCE
In his first assigned error, defendant challenges the sufficiency of the evidence used to convict him. He specifically claims that the evidence was insufficient to support his conviction for second degree murder because there was no evidence to prove that he had the requisite intent to kill or inflict great bodily harm or intent to commit aggravated burglary. He argues his mere presence at the scene of the murder is insufficient to convict him of being a principal to the crime.
The constitutional standard of review for determining the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. *268 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78. This court has explained its standard of review where circumstantial evidence is involved in proving a case:
The reviewing court `does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.' Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
State v. Lovick, 00-1833 (La.App. 5 Cir. 5/16/01), 788 So.2d 565, quoting State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including aggravated, burglary, even though he has no intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1(A). The state presented its case under both theories of second degree murder: specific intent and felony murder.
Under specific intent murder, the state must prove that defendant had the specific intent to kill or to inflict great bodily harm. State v. Dunn, 94-776 (La. App. 5 Cir. 2/15/95), 651 So.2d 1378. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant. State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, writ denied, 00-0105 (La.6/30/00), 765 So.2d 1065. Whether a defendant possessed the requisite intent in a criminal case is for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Meyers, 95-750 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, writ denied, 97-0234 (La.6/20/97), 695 So.2d 1350.
Under felony murder, the state must prove the commission of the underlying felony or the attempt thereof. In promoting this theory, the state argued the victim was killed during the commission of an aggravated burglary. Aggravated burglary is the unauthorized entry into an inhabited dwelling with the intent to commit a felony or theft therein if the offender is armed with a dangerous weapon upon entry, arms himself after entering, or commits a battery upon any person while inside or upon entering or leaving the house. LSA-R.S. 14:60; State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
The state readily conceded that it did not know and did not have a position as to which of the three perpetrators was the gunman. Therefore, the state's apparent objective was to prove defendant was at least a principal to second degree murder. A principal is defined as:
[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
*269 LSA-R.S. 14:24. Only those persons who "knowingly participate in the planning or execution of a crime" are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427; State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565. However, "it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225.
In the present case, the evidence shows defendant was present in Slidell when Strippling and Dickerson were planning to kill the victim and take the victim's stereo. Although the record does not indicate the specific term "kill" was used during the conversation in Slidell, defendant clearly understood Strippling and Dickerson wanted to prevent the victim from testifying. He further understood Strippling and Dickerson were making plans to shoot the victim. Additionally, this conversation regarding revenge on the victim took place while guns were being wielded. Furthermore, when the victim's name came into conversation, Strippling loaded one of the two guns with hollow tip bullets. Also during this planning phase, a key to the victim's apartment was produced. Defendant was present during the entire conversation and witnessed the actions and demeanor of Strippling and Dickerson. Knowing the plan, defendant still chose to leave Slidell with Strippling and Dickerson, who were armed with a gun and the key to the victim's apartment, and go to the victim's apartment on the Westbank in Terrytown.
In addition, defendant initially lied about his participation in the plan once he first arrived at the victim's apartment. In his first statement, defendant claimed he never got out of the car. He stated he was asleep in the car and was awakened by the sound of gunshots. However, defendant later admitted in a second statement that he actually went into the victim's apartment with Dickerson. He explained how Dickerson entered the apartment with the key. Defendant further explained that at some point he handed Dickerson the gun. Defendant further stated that he saw the victim lying in the apartment. Furthermore, defendant returned to the victim's apartment for the stated purpose of making sure the victim was dead. Also, defendant did nothing to prevent the crime; he fled the scene rather than rendering assistance after the victim was shot; and defendant saw a police officer after leaving the victim's apartment the first time and did not attempt to report the shooting. From this evidence, the jury found that defendant was at least a principal to second degree murder.
An appellate court's primary function is not to redetermine the defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury's conclusion. State v. Banford, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671.
In the present case, the jury chose to believe the testimony which implicated defendant in the crime. Viewing the evidence in a light most favorable to the prosecution, a rational juror could conclude, *270 from the totality of the evidence presented by the state, that defendant was a principal to the second degree murder of David Johnson, under the specific intent or felony murder provisions of the statute. Accordingly, this assigned error is without merit.

EXCESSIVENESS OF SENTENCE
In his second assigned error, defendant argues that his mandatory life sentence is excessive considering his youthful age of 17 at the time of the offense and the facts of the case which show he was merely a witness to the crime of others.
Both the United States and Louisiana Constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. amend. VIII; La. Const. of 1974, art. I, § 20. A sentence is constitutionally excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or is nothing more than the needless and purposeless imposition of pain and suffering. State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839. If a trial judge finds that a mandatory sentence makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the court has the option and duty to reduce such a sentence to one that would not be constitutionally excessive. State v. Dorthey, 623 So.2d 1276 (La.1993).[3]
Second degree murder carries a mandatory life sentence. LSA-R.S. 14:30.1. It is presumed that a mandatory minimum sentence is constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. In fact, Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder is not constitutionally excessive. See State v. Lovick, 00-1833 (La.App. 5 Cir. 5/16/01), 788 So.2d 565, and cases cited therein.
A court may only depart from the mandatory sentence if it finds clear and convincing evidence in the particular case before it that would rebut the presumption of constitutionality. State v. Johnson, supra.[4] In order to rebut the presumption of constitutionality, the defendant must clearly and convincingly show that he is exceptional, that is, because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. The Louisiana Supreme Court has cautioned that a downward departure from a mandatory minimum sentence should only *271 be made in rare cases. State v. Lindsey, 99-3256 (La.10/17/00), 770 So.2d 339; State v. Johnson, supra.
In the present case, defendant offered no evidence at sentencing to rebut the presumption of constitutionality. In fact, no evidence was presented at the time of sentencing and no argument was made regarding a downward departure from the required sentence. Thus, defendant failed to carry his burden to rebut the presumption of constitutionality of his mandatory life sentence. Furthermore, it is noted that defendant's young age of 17 alone does not appear to provide sufficient grounds to deviate downward from a mandatory life sentence. See State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147, and State v. Creel, 508 So.2d 859 (La.App. 5 Cir.1987), writ denied, 532 So.2d 171 (La.1988). Accordingly, we find no error in the sentence imposed by the trial judge. This assigned error is without merit.

ERROR PATENT REVIEW
In his final assigned error, defendant requests that we review the record for errors patent in accordance with LSA-C.Cr.P. art. 920. Our review reveals that the trial court did not properly advise defendant of the prescriptive period for post conviction relief as set forth in LSA-C.Cr.P. art. 930.8. The trial judge informed defendant that he had "two years in which to file for post conviction relief," whereas he should have informed him that he had "two years after the judgment of conviction and sentence has become final" within which to apply for post conviction relief. Therefore, we instruct the trial court to send appropriate written notice to defendant of the correct statement of the law regarding the prescriptive period for post conviction relief and to file written proof that defendant received the notice.
For the reasons set forth herein, we affirm defendant's conviction and sentence. The matter is remanded, however, for further action in accordance with this opinion.
CONVICTION AND SENTENCE AFFIRMED, REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Co-defendants Levy Dickerson and Richard Strippling were also charged in the indictment. However, the cases were severed and each defendant proceeded to trial separately.
[2] The victim's girlfriend, Misty, testified that she had lost her key to Johnson's apartment while she was living in the Dickerson apartment.
[3] While Dorthey involved a mandatory sentence under the habitual offender laws, the sentence review principles espoused in Dorthey are applicable to mandatory sentences imposed by substantive criminal statutes. State v. Fobbs, 744 So.2d 1274 (La.9/24/99); State v. Brown, 01-160 (La.App. 5 Cir. 5/30/01), 788 So.2d 667.
[4] State v. Johnson, supra, involved the issue of a downward departure from the mandatory minimum sentence under the Habitual Offender Law as opposed to a departure from the mandatory sentence under a substantive criminal statute. In Johnson, the supreme court reexamined Dorthey and clarified the factors to be considered when a downward departure from a mandatory minimum sentence was contemplated. However, since the supreme court has determined that the sentencing review under Dorthey is not limited to an enhanced sentence under the Habitual Offender Laws, it follows that the analysis and rationale espoused in Johnson are equally applicable to mandatory sentences not involving the habitual offender statute.